**UNITED STATES of America,**

v.

**Philip VASTA, Edward Margiotta, Oreste Abbamonte, Jr., Michael Paradiso, Arnold Squitieri, Angelo Amen, Richard Romano, Angelo Meli, Mark A. Deleonardis, Michael Deleonardis, Sr., Michael Deleonardis, Jr., Oreste Abbamonte, Sr., Catherine Abbamonte, Patricia Toron, Defendants.**

No. SSS 86 Cr. 60 (RLC).

United States District Court,
S.D. New York.

Oct. 28, 1986.

Rudolph W. Giuliani, U.S. Atty., for S.D. N.Y., New York City, for U.S.; Michael R. Bromwich, Annmarie Levins, Steven A. Standiford, Robert L. Ullman, Asst. U.S. Attys., of counsel.

Gerald L. Shargel, New York City, for Philip Vasta; Steven Reiss, of counsel.

Murray Richman, Bronx, N.Y., for Edward Margiotta.

Jonathan N. Boxer, Burns, Burger & Boxer, Westbury, N.Y., for Oreste Abbamonte, Jr.

Howard L. Jacobs, New York City, for Michael Paradiso.

Lawrence H. Schoenbach, New York City, for Angelo Amen.

Arthur Miller, Farber and Miller, Brooklyn, N.Y., for Richard Romano.

Ruth M. Chamberlin, The Legal Aid Society, Federal Defender Services, New York City, for Angelo Meli.

Michael Hurwitz, New York City, for Arnold Squitieri.

Michael P. Joseph, Joseph & Stalonas, New York City, for Mark A. DeLeonardis.

Daniel Noble, New York City, for Michael DeLeonardis, Sr.

Howard Mulholland, New York City, for Michael DeLeonardis, Jr.

John Jacobs, New York City, for Patricia Toron.

Richard Rehbock, New York City, for Oreste Abbamonte, Sr. and Catherine Abbamonte.

ROBERT L. CARTER, District Judge.

This case charges 14 defendants in a 23-count indictment with various violations of the federal narcotics laws and defendant Vasta with several firearms infringements. The indictment charges all defendants with conspiring to distribute heroin. Defendants Philip Vasta and Oreste Abbamonte, Jr. are charged with operating a continuing criminal enterprise for the distribution of narcotics. Defendants Arnold Squitieri and Michael Paradiso are charged with aiding and abetting Abbamonte in his continuing criminal enterprise activities; and various defendants are charged with possession and distribution of narcotics. In addition, criminal forfeiture of $5.8 million in cash seized by Drug Enforcement Administration ("DEA") agents from Vasta is sought.

Defendants have filed a multitude of pretrial motions including motions to sever, dismiss, transfer to the Eastern District of New York, for bills of particulars, to suppress various intercepted conversations, post-arrest statements and seized property on the grounds that several searches were unlawful. The court of necessity has spent considerable time and effort studying the voluminous papers submitted in connection with these motions. However, many of the claims are supported only by conclusory allegations or are otherwise wholly without merit, warranting dismissal out of hand. The court deals, hereafter, only with those of defendants' various claims that require discussion. Any motion not expressly discussed is, therefore, to be considered summarily dismissed.

A. *Venue*

We start with the motions to dismiss the indictment on venue grounds. The government concedes that venue is improper in

this district in respect of counts 5, 6, 9, 10, 11, 14, 15 and 17–23. The motions to dismiss those counts are granted. As to the remaining counts 1–4, 7–8, 12–13, the government contends that its proof will show the occurrence of numerous acts in this district to satisfy venue requirements.

The government charges the existence of a continuing criminal enterprise and expects to show defendants' participation in the enterprise, various overt acts in furtherance of the conspiracy charge, and various acts in this district supporting the substantive counts. Venue, of course, is appropriate in this district if any part of the crime charged took place here. *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977) ("Venue turns on whether any part of the crime was committed within the district, and the government need only prove venue by a preponderance of the evidence."). Where Congress has made no specific provisions for venue, proper venue is determined on the basis of "the nature of the offense and the location of the acts constituting it." *United States v. Chestnut*, 533 F.2d 40, 46 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). "The constitutional standards for venue concern the locality of the substantive offense rather than the location of the offender at the time of the offense." *Id.* at 47.

The motions by various defendants to transfer the case to the Eastern District are patently frivolous. Such a motion has substance only where the movant shoulders the burden of establishing that the transfer serves the needs of justice and the convenience of the parties and witnesses. *United States v. Aronoff*, 463 F.Supp. 454, 461 (S.D.N.Y.1978) (Cannella, J.). Obviously, these factors can not be better served by a trial being moved a distance of a mere couple of miles from this courthouse. Accordingly, motions for change of venue as to counts 1–4, 7–8 and 12–13 are denied.

## B. *Motions to Sever*

Various defendants contest their joinder in this single indictment, but these claims uniformly lack substance. Rule 8(b), F.R.Cr.P. authorizes the joinder of two or more defendants in an indictment when they have "participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The rule has been interpreted to allow joinder where the offenses are the product of a common criminal scheme or plan. *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). The fact that all the defendants are not charged in each count of the indictment is of no moment since Rule 8(b), F.R. Crim.P. specifically permits joinder in cases where individual defendants are charged in some but not all counts as long as the offenses have a common nexus. *Id.; United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976) ("joinder of a conspiracy count and the substantive counts arising out of the conspiracy is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common plan").

Here, as in *United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), "[t]he indictment ... charge[s] all the defendants with one overall count of conspiracy, making joinder under Rule 8 proper. ... [O]nce the Rule 8 requirements were met by the allegations in the indictment, severance thereafter is controlled entirely" by Rule 14, F.R.Cr.P., "which requires a showing of prejudice." *Id.* at 731. Indeed, a defendant must demonstrate far more than that severance would create a better chance of acquittal, *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), but even that much has not been shown.

A party seeking to have his case severed and tried separately pursuant to Rule 14, F.R.Cr.P. must sustain an extremely heavy burden of persuasion.

*United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). Joint trials, in avoiding the necessity of separate proceedings, conserve judicial, juror and witness resources, *United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), and to warrant severance where joinder is appropriate, a defendant must show such prejudice as to constitute a miscarriage of justice. *United States v. Wilkinson,* 754 F.2d 1427, 1435 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *accord United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). That the government's case may be weaker against the moving defendants than against other defendants or that there may be an adverse spillover effect as to less culpable defendants, as is urged, e.g., by defendants Catherine and Oreste Abbamonte, Sr., Michael Paradiso, Richard Romano and Patricia Toron, does not per se warrant severance. *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984). There is always the reasonable expectation that the jury will follow the court's instructions to weigh the evidence as to each defendant separately and independently. *United States v. Campanale,* 518 F.2d 352, 359 (9th Cir.1975) (per curiam), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Indeed, the instant indictment lends support to that expectation since the charges against each defendant are definitive enough that there is little reason to fear that a jury will be confused as to what evidence to consider in determining the guilt or innocence of each defendant. Moreover, it is not unusual in multi-defendant joint trials for the jury to find individual defendants guilty on some charges and not guilty on others or even to fail to agree on some counts while disposing of others. At any rate, severance would not solve the spillover effect and similar problems since the government would be able in separate trials to introduce the same evidence it is prepared to adduce at a joint trial.

■ The senior Abbamontes, the mother and father of Oreste Abbamonte, Jr., one of the principal defendants, seek a severance on the grounds that their son would provide exculpatory testimony for them at a severed trial. In *United States v. Finkelstein,* 526 F.2d 517, 523–525 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976), the Court of Appeals set forth the following factors for a trial judge to consider when faced with motions for severance based on claims of the exculpatory testimony of a co-defendant: (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial damaging impeachment.

Here, the Abbamontes have offered only a conclusory statement that the son would testify at their severed trial. This does not suffice. *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). There is no affidavit from the son evidencing a commitment to testify and no indication of the nature of the putative testimony which would have to be evaluated by the court to determine whether it is indeed exculpatory and if so whether it would be cumulative. Since the son has a long criminal record, including three federal narcotics convictions, and has been convicted of the crime of obstruction of justice in conspiring to murder a government witness, the likelihood of the son's testimony being successfully nullified by a scathing attack on his credibility is assured.

■ Finally, the claim that the familial ties of some of the defendants warrants separate trials for each family member has no merit. Accordingly, all motions for severance are denied.

■ The arguments that the indictment is fatally defective in charging a single

rather than a series of conspiracies are premature. Whether the indictment erroneously charges a single conspiracy when in fact there are two can be determined only from the evidence adduced at trial and cannot be the subject of pretrial disposition. *United States v. Persico*, 621 F.Supp. 842, 857 (S.D.N.Y.1985) (Keenan, J.). Whether there is a single or multiple conspiracies is "a question of fact for a properly instructed jury." *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir.1980). The proper time for such arguments is at the close of the government's case.

### C. *Identification of Romano*

■ Defendant Romano challenges the validity of the procedures used to identify him as the supplier of ½ kilo of heroin to an undercover agent on September 6, 1985. The challenge is made on information and belief that a photograph of Romano was shown to the agent who dealt with Romano when the agent made the identification.

The government asserts that on September 6, 1985, not only the undercover agent in question, to whom Romano supplied the heroin, but a number of surveillance agents had observed Romano. At that time his true identity was not known. As a result of further investigation, the DEA concluded that Romano was the September 6th supplier. A photograph of the defendant, secured from the Federal Bureau of Investigation ("FBI"), was shown to the surveillance agents, all of whom positively identified Romano as being the person they had observed meeting with the undercover agent on September 6. That photograph was then made part of a photographic spread of six photographs, which was sent to the undercover agent, and he picked out the photograph of Romano as the party with whom he had dealt.

The identification procedures thus described were not impermissibly suggestive within the meaning of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The undercover agent, whose identification of Romano was most critical, picked Romano's photograph from a photographic spread. The agent had ample opportunity to observe Romano, and knew he would be required to identify his heroin supplier. As a trained law enforcement officer, careful attention to Romano's characteristics was standard procedure. Nothing presented by defendant suffices to raise any question about the propriety of the procedure or the accuracy of the identification. Therefore, cause sufficient to warrant a hearing has not been shown.

### D. *Motions for Bills of Particulars*

Defendants Angelo Meli and Abbamonte, Jr. move for a bill of particulars indicating among other things the exact dates, times and locations of any meetings or conversations constituting a conspiratorial agreement, and the time when Meli joined the conspiracy or took action to further the conspiracy. The indictment provides each defendant with definite notice of the charges against him. Defendants have been given access to all of the tapes from which the government will select those to be used at trial and the government either has already identified the tapes it plans to use at trial or will do so well in advance of the commencement of trial. Final transcripts of the tapes the government plans to use are to be supplied to defendants before trial. In the younger Abbamonte's case the government has indicated that it proposes to use evidence adduced at a recent criminal trial before Judge Edelstein to prove the charges against Abbamonte in Count One of the indictment. Defendants have been supplied with full discovery of all materials the government is required to supply.

■ A motion for a bill of particulars is granted where necessary to furnish a defendant with facts not manifest in the indictment in order to provide the defendant with an adequate opportunity to prepare his defense and to prevent surprise. *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). Unless necessary to afford such protection, a defendant is not entitled to have the

government's evidence disclosed before trial, *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974), nor is a defendant permitted to obtain a preview of the government's proof. *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y.1962) (Edelstein, J.). Since defendants' motions for bills of particulars seek to achieve these prohibited objectives, the motions are denied.

### E. *Aiding and Abetting a Continuing Criminal Enterprise*

■ Defendants Squitieri and Paradiso are charged in Count Four with aiding and abetting defendant Abbamonte, Jr. in the operation of the continuing criminal enterprise charged in Count Three of the indictment. In enacting 21 U.S.C. § 848, Congress was concerned with large-scale profit-making enterprises engaged in the illegal importation, manufacture and distribution of controlled substances. The language chosen to define the offense charged was carefully selected to distinguish minor enterprise "employees" from those who conceive and coordinate enterprise activities. Squitieri and Paradiso are not Abbamonte's employees, nor are they employees of the enterprise he operates. The government contends that these defendants are independent actors who helped keep Abbamonte's illegal activities in operation while he was incarcerated. Their independent activities to support Abbamonte's enterprise made them, the government argues, aiders and abettors of Abbamonte. As such, they expose themselves to liability under the statute as principals. *United States v. Southard*, 700 F.2d 1, 19 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Squitieri and Paradiso argue that Congress could not have intended aiders and abettors to be subject to the same harsh penalties that a drug kingpin is subject to under § 848. While this seems clearly correct as to low level accomplices, it does not follow that aiders and abettors who are themselves independent entrepreneurs, are exempt from the reach of § 848 if they expend substantial effort in keeping the kingpin's business operative.

Defendants' position was rejected in *United States v. Ambrose*, 740 F.2d 505 (7th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985). There the court held that ten former policemen who were charged with providing protection to drug kingpin operators and their employees were aiders and abettors in violation of § 848. The court concluded that they were not kingpin employees "but the kingpin's police protectors." *Id.* at 508. "The effectiveness of the kingpin statute might therefore be reduced if a kingpin's police protectors ... whose efforts enabled large drug enterprises to flourish brazenly for years, could never be punished as aiders and abettors" under § 848. *Id.*

Although they are not corrupt law enforcement officers, the government contends that Squitieri and Paradiso enabled Abbamonte, while incarcerated, to communicate with his narcotics employees and to obtain supplies of heroin for the organization when necessary, and that Squitieri's and Paradiso's assistance was of critical importance in keeping Abbamonte's operation alive. The rationale of *Ambrose* therefore applies. The fact that neither defendant himself can be classified as a drug kingpin to warrant being proceeded against as a principal is irrelevant. See, e.g., *Haggerty v. United States*, 5 F.2d 224, 224–25 (7th Cir.1925), where the conviction of a federal officer for aiding and abetting the impersonation of a federal officer to defraud the government was upheld even though the defendant federal officer could not himself have been convicted of impersonating a federal officer. Whether the government's evidence suffices at trial to establish Squitieri's and Paradiso's involvement to the extent indicated must await the event. The government's assertions, however, suffice at this stage to withstand defendants' motion to dismiss Count Four's aiding and abetting allegations as to them.

### F. *Motions to Suppress Court-Ordered Wiretaps*

■ The motion to suppress the evidence obtained through a court-ordered

wiretap of Amen's and Squitieri's telephone is denied. The motion asserts that the order was not based on probable cause and that the government failed to minimize the interception of non-pertinent conversations. Eavesdropping warrants have a presumption of validity, *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983), and substantial deference must be given to the prior judicial determination of probable cause. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). The application for authorization of electronic surveillance of Amen's and Squitieri's telephones were made to Judge John Bissell of the United States District Court for the District of New Jersey. Judge Bissell granted the application on August 9, 1985, finding probable cause to believe that Squitieri, Alphonse Sisco, the younger Abbamonte, Mark DeLeonardis and Amen were committing and would continue to commit offenses including distribution and possession with intent to distribute narcotics and the attempt to do so, conspiracy to commit these offenses, and use of wire facilities to facilitate these unlawful activities.

■ The affidavit submitted to Judge Bissell provides adequate factual details warranting the court's finding of probable cause and issuance of the order. The affidavits indicate that undercover agents had bought heroin from DeLeonardis on three separate occasions between March and May, 1985. DeLeonardis gave the agent a beeper number to contact him, and that number was found to be subscribed to by Amen. At one of the narcotics transactions the juxtaposition of DeLeonardis and Amen while the money and heroin were passing hands provided circumstantial evidence that Amen was DeLeonardis' supplier. Moreover, the pen register and toll record analysis of the telephones of Amen, DeLeonardis and Squitieri show numerous phone calls from each of these phones to the other and some collect calls from Lewisburg which coincide directly with the narcotics transaction between the undercover agent and DeLeonardis. In addition, the government's affidavit indicated that there

was a pattern of collect calls to Amen's phone from Danbury, Connecticut during Abbamonte's residence at the Danbury prison and a similar pattern of collect calls from Lewisburg penitentiary during Abbamonte's incarceration at that institution. See paragraphs 92–105 inclusive of Exhibit F (affidavit of Special Agent Douglas Marshall) to the Government's Memorandum in Opposition to Defendants' Pre-trial Motions at 58–72. These facts provided ample foundation to support a finding of probable cause, and there was no reason for Judge Bissell not to accept and act upon these factual assertions of the government agents in authorizing the wiretaps.

■ The minimization complaint lacks substance since the challenge is nothing more than a conclusory allegation. A detailed report was filed with Judge Bissell every seven days, and he received 15 such reports. After reviewing the surveillance logs included with the first four reports, the judge advised the agents and prosecutor that having reviewed the surveillance logs in the first four reports, it was no longer necessary for him to see the actual surveillance logs. The judge was satisfied that those monitoring the telephone were properly complying with the court's minimization order. Whether proper minimization has occurred is based on the particular facts and circumstances of the surveillance. The standard to be applied is that of reasonableness. *See Scott v. United States,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978); *United States v. Manfredi,* 488 F.2d 588, 600 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Judge Bissell was confident that the agents were proceeding properly, and defendants will have to supply more than conclusory assertions of wrongdoing to warrant further inquiry about the matter by the court.

■ Squitieri was given until August 8, 1986, to make his motion in respect of a challenge to the wiretap of his telephone. He now seeks to preserve his right to make such a challenge at some later date. Not

having taken advantage of the opportunity to challenge the order, whatever objections he might have are deemed waived and no future challenge will be entertained.

 Vasta's challenge to the wiretap authorized under New York Law is rejected. The challenge is based on the failure to name Vasta in the eavesdropping warrant. When a party is not named in an eavesdropping warrant, there is no actionable wrong absent a showing of a deliberate attempt to mislead the court or proof that the exclusion of the name affected the issuance of the warrant. *People v. Watkins*, 63 A.D.2d 1033, 406 N.Y.S.2d 343, 345 (2d Dep't), *cert. denied*, 439 U.S. 984, 99 S.Ct. 575, 58 L.Ed.2d 656 (1978) (no proof that authorities "withheld the names of the defendants [so as not to be prevented] from intercepting arguably privileged exchanges. There is no reason to believe that the inclusion of the names of the defendants would have caused the court to reject the application for the warrant."). In one of the affidavits filed in support of the issuance of the warrant, Vasta was expressly identified, his criminal record discussed and the agent stated that calls on the tapped phone from Vasta were expected. The court therefore had notice of Vasta's identity and role when the warrant was issued. *People v. Calogero*, 84 A.D.2d 667, 446 N.Y.S.2d 615, 617 (4th Dep't 1981) ("we find no merit in defendant's claim that because he was not named in the warrant application, the tape of his conversation with another unnamed party should be suppressed").

 The argument that the state constitution mandates suppression is without merit. *People v. Gnozzo*, 31 N.Y.2d 134, 335 N.Y.S.2d 257, 264–65, 286 N.E.2d 706 (1972), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1373, 35 L.Ed.2d 610 (1973) holds that neither the federal nor the state constitution prohibits the use of conversations seized pursuant to a valid eavesdropping warrant against persons not named in the warrant. *People v. Gasalini*, 126 Misc.2d 665, 483 N.Y.S.2d 899, 902–03 (S.Ct. N.Y. County 1984) holds that art. 1 § 12 of the state

constitution requires only that the application—not the warrant—identify the persons whose conversations are to be intercepted. Since Vasta was named in one of the affidavits filed in support of the application, issuance of the warrant meets New York State Constitutional requirements.

 Under federal law the failure to name Vasta does not require suppression. *See United States v. Donovan*, 429 U.S. 413, 428, 97 S.Ct. 658, 668, 50 L.Ed.2d 652 (1977). The court is not obligated to apply automatically "all provisions of a state wiretap statute containing more stringent requirements than those prescribed by" federal statute. *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). The court is required to apply only those more stringent state yardsticks designed to protect "an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character." *Id.* (footnote omitted). The naming requirement existing in both the state and federal statutes has no impact on the invasion of privacy which Title III seeks to minimize. If an individual is named in the warrant and his telephone conversations are intercepted and another individual not named has his telephone intercepted, the privacy parameters are unchanged. The naming requirement's basic function is to insure that the individual who is being electronically surveilled at some point is given notice of the interceptions. The naming provision, therefore, is not a state requirement which under federal law must be met to legitimate the issuance of a wiretap warrant.

## G. Search of Prison Cells

The search of the prison cells of Abbamonte and Paradiso is conceded by the government to violate the holding in *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), decided June 30, 1986, and the government has stated that it will not utilize the fruits of these searches at trial. The government represents that no other admissible evidence was obtained as a re-

sult of these searches. Thus, no taint hearing is required.

## H. *Validity of Search Warrant*

Defendant Vasta moves for a suppression hearing to determine the validity of a warrant issued on January 8, 1986, by Magistrate A. Simon Chrein to search an unoccupied house at 308 Argyle Road in Mineola, New York. The defendant contends that the application for the warrant was based on a prior, warrantless search.

Defendant points to two pieces of evidence in support of this claim. First, defendant alleges that a statement made by the Assistant United States Attorney ("AUSA") in his oral application for the warrant indicates prior knowledge of the contents of the house. Second, defendant argues that DEA agents could not have seen, as was alleged in the application for the warrant, what was inside the house by looking through the window of the front door. The front door window, defendant says, was too high off the ground for anyone to look through.

Defendant does not contend that the warrant was invalid on its face, nor does he dispute that there was ample supporting material submitted to obtain the warrant. In their oral application for the warrant before Magistrate Chrein, AUSA Peter Lieb and DEA Special Agent Douglas Marshall relied on evidentiary indicia that the property at 308 Argyle Road was being used as a "stash house." Most important was their report that agents who had watched the house for months had seen nothing to show that the house was used as a residence. Indeed, government agents had observed that the house lights operated by means of a timer, and that the house appeared to be bare of any furniture.

"A defendant who seeks to suppress evidence bears the burden of showing that disputed issues of material fact exist before an evidentiary hearing is required." *United States v. Castellano*, 610 F.Supp. 1359, 1439 (S.D.N.Y.1985) (Sofaer, J.). General and conclusory allegations do not generate evidentiary hearings. *Grant v.*

*United States*, 282 F.2d 165, 170 (2d Cir. 1960).

Vasta's first contention is that a statement by AUSA Lieb requesting that weapons be included in the search warrant revealed prior knowledge of the contents of the house that could only have been gained through an undisclosed warrantless search. To understand the allegation and the statement's obvious intended meaning, it is necessary to put the statement in context.

After Lieb and Marshall had explained what they believed they would find at the house, Magistrate Chrein went over their request with them:

CHREIN: And so you're looking for money, narcotics[,] cutting agents[,] uh, scales, books and records.

MARSHALL: Correct.

LIEB: Uh, I uh, I also one last thing, ah, that uh, I've included which I think might be included would be weapons and ammunition.

CHREIN: Did you say one of the people arrested had a weapon?

MARSHALL: That's correct.

Exhibit H to Government's Memorandum in Opposition to Defendants' Pre-Trial Motions at 14. The conversation then continued, with Lieb listing the items and the Magistrate filling them in on the warrant. *Id.* at 14–15. When Magistrate Chrein apparently thought he had listed all the requested items, Lieb reminded him of one item he had forgotten, and this exchange contains the allegedly revealing statement:

LIEB: Magistrate, there were, the weapons, uh, I realize that the weapons uh, we haven't listed the weapons in this.

CHREIN: All right. It will be after the word paper as well as weapons.

LIEB: O.K. that's weapons.

CHREIN: Of course if you were to find weapons in the various places you look for the remaining contraband. It's an academic question. I mean, no one would suppress them.

*Id.* at 17.

Defendant's contention is that this exchange establishes Lieb's knowledge that

"there were" weapons in the house. Read in context, however, it is clear that the AUSA was referring to the Magistrate's failure to list the already mentioned weapons in the warrant. Any other reading, without some concrete indicia that a different reading is required, strains the imagination. Defendant contends that in a narcotics case there is no reason other than prior knowledge for an explicit request that weapons be mentioned in a search warrant. Defendant's Memorandum of Law at 3. Since violence is indigenous to narcotics activity, however, a prosecutor's request for authorization to search for weapons seems nothing short of routine. Mr. Lieb's statement, while inelegant, is surely commonplace.

Defendant's second contention is that DEA agents could not have learned that the house contained no or little furniture by looking through the window of the front door, as was represented in the application for the warrant.

In order to raise a factual issue concerning the validity of a seizure such that a hearing is required, the defendant must support his claim with an affidavit based on personal knowledge. *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir.1967); *United States v. Gregory*, 611 F.Supp. 1033, 1044 (S.D.N.Y.1985) (Weinfeld, J.). Instead, defendant only offers two photographs of the front of the house. *See* Exhibit B to Defendant's Memorandum of Law. Not only are these photographs insufficient as a matter of law, but they are utterly unconvincing as a matter of fact. It is impossible to conclude on the basis of the two photographs that a DEA agent could not have seen through the window. The relative ease with which the height of the window could have been measured, if defendant was serious about this contention, sheds even greater doubt on the probative value of the proffered photographs.

The only evidence which could undercut the agents' assertion that they were able to see into the house from the outside is the discrepancy in the government's statements about which windows it was able to look through. While in support of its application for the search warrant, the government mentioned only that agents had looked through the front door, the affidavit provided by the government in opposition to the motion to suppress asserts that government agents also looked through other front windows and a window on the side of the house. Affidavit of Michael R. Bromwich, Sept. 2, 1986, at 14, ¶ 34.

This discrepancy alone, however, is not sufficiently troubling to warrant a hearing. A search warrant does not demand such microscopic analysis. *See National City Trading Corp. v. United States*, 487 F.Supp. 1332, 1336 (S.D.N.Y.) (Leval, J.), *aff'd*, 635 F.2d 1020 (2d Cir.1980) (warrants "cannot properly be subjected to the same standards of dissection as might befit a criminal statute, an indictment, or a trust indenture"). The government's failure to include the fact that it looked through other windows, without more, simply does not raise an issue of fact sufficient to require a hearing. *See United States v. Castellano, supra*, 610 F.Supp. at 1439. Indeed, the defendant does not contest the fact that the other windows are accessible. He merely cites the discrepancy between the warrant application and the Bromwich affidavit as a sufficiently suspicious ground for a hearing. We are not persuaded.

### I. *Motion to Suppress Post-Arrest Statements*

Defendant Vasta also moves for a hearing to determine whether two potentially inculpatory post-arrest statements he made are admissible at trial. The defendant asserts that he was not given a *Miranda* warning upon his arrest, Affidavit of Philip Vasta, July 23, 1986, at 2, ¶ 4, and that a hearing is required to determine whether his statements were made voluntarily. In response, the government argues that he was given his *Miranda* warnings, Affidavit of Michael R. Bromwich, Sept. 2, 1986, at 15, ¶¶ 35–36, and that even if he was not, his unprovoked statements are admissible.

Vasta made two potentially inculpatory statements between the time he was arrested and his arrival at DEA headquarters. Defendant does not challenge the government's position that both these statements were uttered spontaneously and were not in response to questions put by government officials.

Vasta's first statement, made immediately upon his arrest, was "Why don't you just go ahead and shoot me ... just put a bullet right between my eyes." Affidavit of Philip Vasta, July 23, 1986, at 1, ¶ 3. Then, while in route to DEA headquarters, Vasta made a longer statement:

> How long were you guys following me? How did you get into the restaurant parking lot before I did? I don't understand how you knew I would be there ... was the other guy I met with arrested, too? ... you don't have to tell me anything, but you never know when a favor can be returned.... Do you follow boxing? Did you ever hear of Saad Muhammed[?] I just signed him—a great fighter.

*Id.*

 If a defendant had an absolute right to be given *Miranda* warnings upon arrest, a conflict between the defendant and the government over whether those warnings were given would mandate a hearing. *See United States v. Castellano, supra,* 610 F.Supp. at 1439 (hearing required on showing of a dispute over a material fact). The question of when *Miranda*'s protections come into play, however, requires a closer analysis than defendant has given it.

The obvious starting point is the *Miranda* decision itself, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is important to remember that the *Miranda* court did not bar the admission of voluntary statements spontaneously provided by the defendant:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.

*Miranda v. Arizona, supra,* 384 U.S. at 478, 86 S.Ct. at 1629; *see also Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) ("the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent").

The implication of these parameters to *Miranda* safeguards is made explicit in *United States v. Carr,* 445 F.Supp. 1383, 1388 (D.Conn.), *aff'd,* 584 F.2d 612, 619 (2d Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), a case virtually indistinguishable from this one. In *Carr,* the defendant had been arrested following a report that tied his car to a shooting. At the time of his arrest, defendant and several other persons were sitting in his car. Immediately after defendant was placed under arrest, the arresting officers discovered weapons in the trunk of the car. When the weapons were seized, defendant exclaimed that the weapons belonged to him, and not to his companions. Defendant had not yet been given his *Miranda* warnings when he said this. The warnings came thereafter. At trial, the court held the statement admissible:

> Although defendant's statement was made after his arrest ... it is important to note that the statement was not made in response to police interrogation. It was a spontaneous statement motivated by a desire to protect the other occupants of the car.... [D]efendant's statement was compelled by a concern for his companions rather than by custodial interrogation. Such statements are admissible even though *Miranda* warnings have not been given.

*United States v. Carr, supra,* 445 F.Supp at 1388 (citations omitted); *see also United*

*States v. Bailey,* 728 F.2d 967, 969–70 (7th Cir.), *cert denied,* 467 U.S. 1229, 104 S.Ct. 2686, 81 L.Ed.2d 881 (1984) (*Miranda* does not apply to a spontaneous, unwarned custodial confession to a DEA agent).

As the Second Circuit made clear in *United States v. Vigo,* 487 F.2d 295, 299 (2d Cir.1973), allowing the admission of spontaneous unwarned statements into evidence is fully consonant with the rationale behind *Miranda.* In admitting a spontaneous voluntary statement the defendant had made upon his arrest even though he had been given an abbreviated *Miranda* warning that did not inform him that anything he said could later be used against him, the *Vigo* court explained:

> [The defendant's] statements were voluntary within the meaning of [*Miranda* ], and their admission into evidence did not violate the Fifth Amendment privilege against self-incrimination. Nor does it contravene the purpose behind *Miranda* of curtailing illegal custodial interrogation by law enforcement authorities. The statements were made immediately after [the defendant's] arrest, at the scene of the arrest and before any systematic inquiry was begun by the arresting agents. None of the inherently compelling factors of station-house interrogation were present. The arresting agents did not coerce or deceive him.

*Id.*

These cases make clear that where a defendant spontaneously and voluntarily makes self-incriminating statements without any prompting by law enforcement officers, his statements are admissible even if *Miranda* warnings had not yet been recited to him.

■ A voluntariness hearing is not required. 18 U.S.C. § 3501 requires the trial judge to determine any issue as to voluntariness before a confession or self-incriminating statement is admitted into evidence. The statute, however, explicitly states that "[n]othing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone...." 18 U.S.C. § 3501(d); *see United States v. Bailey, supra,* 728 F.2d at 970 (voluntariness hearing unnecessary under § 3501(d) when statement was not made in response to interrogation); *see also United States v. White,* 417 F.2d 89, 92 (2d Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970) (Congress did not intend § 3501 to expand the rights of criminal defendants beyond the scope of protection provided by *Miranda* and its progeny).

In the face of the case law and explicit legislation, defendant's arguments must fail. It is true, as defendant contends, that the government bears the burden of establishing the admissibility of a confession by at least a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *United States v. Burger,* 739 F.2d 805, 809 (2d Cir.1984). If the defendant's statements were made in response to interrogation or in some way coerced, the court would of necessity view this motion quite differently. Under the circumstances of this case, however, the failure of the DEA agents to administer *Miranda* warnings before Vasta made his unsolicited statement is insufficient, as a matter of law, to raise an issue as to voluntariness.

Defendant further argues that language from the United States Supreme Court's decision last term in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), mandates a hearing. The language defendant cites, however, is taken wholly out of context. In *Elstad,* the Court held that an unwarned statement given in response to questions posed by police officers did not "taint" a subsequent unwarned statement. In the course of its holding, the Court noted, as defendant reminds us, that "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Id.* at 306, 105 S.Ct. at 1292. The Court's opinion, however, con-

cerned unwarned statements made in response to police questioning. Defendant would have us believe that "voluntary" as used in the Court's opinion applies to spontaneous statements not made under interrogation. Such a reading is too broad. Had the Court intended such a result, it surely would have indicated its break with past precedent. Since Vasta spoke out on his own and not in response to interrogation by DEA agents, *Miranda* warnings were not required.

## J. *Motions to Suppress Prison Telephone Recordings*

Several defendants move on various grounds for suppression of their tape-recorded telephone conversations to and from the United States Penitentiary at Lewisburg. Correctional officers at this federal prison have since October, 1984 recorded all conversations over inmates' telephones. The tape recordings are stored at the prison until the supply of unused tapes is exhausted. Then the tapes are reused by recording over previous conversations. Defendants contend that the recordings thus made are unlawful and must be suppressed. They also argue that even if the recording of conversations was not unlawful, the fact that the conversations on some of the tapes have been recorded over constitutes reckless or intentional destruction of evidence and warrants suppression of the remaining recordings.

Defendants first argue that the tape recordings are illegal under Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520. We have serious doubts, to say the least, that Congress intended Title III to apply to prisons. Title III's legislative history strongly suggests that the "oral communication" that Congress meant by the Act to protect is that between free citizens beyond the prison walls. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), 1968 U.S.Code Cong. & Admin. News 2112 (citing *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962)), *reprinted in* 1968 *U.S.Code Cong. & Admin. News* 2178; *see also United States v. Paul,* 614 F.2d 115, 117–20 (6th Cir.) (Phillips, J., concurring in the result), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980).

■ However, even if, as some courts have found, prisoners' communications generally fall within the scope of Title III, *see United States v. Paul, supra,* 614 F.2d at 116–17; *Campiti v. Walonis,* 453 F.Supp. 819, 823 (D.Mass.1978), *aff'd,* 611 F.2d 387 (1st Cir.1979), the recorded conversations in this case do not. Title III is expressly *inapplicable* to communications intercepted by any device that is operated "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). The correctional officers who conduct the recording and monitoring of inmate conversations at Lewisburg act pursuant to a thoroughly institutionalized, ongoing policy at the prison. Telephone calls are comprehensively recorded and randomly monitored for the purpose of maintaining prison security. The policy is announced in orientation lectures to inmates and in the prison's "Inmate Informational Handbook." The policy is also posted on the telephones themselves.[1] In short, the correctional officers at Lewisburg are unquestionably investigative or law enforcement officers acting in the course of their duties. *See United States v. Paul, supra,* 614 F.2d at 117; *United States v. Clark,* 651 F.Supp. 76, 78–80 (M.D.Pa.1986); *United States v. Rantz,* No. 85–40036–04, slip op. at 8 (D.Kan. Sept. 30, 1985) [Available on WEST-

---

1. The notice posted on the telephone states in English and Spanish:

 The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored.

Exhibit B to Government's Memorandum of Law in Opposition to Defendants' Pre-trial Motions. Defendants do not dispute that they read this notice, but argue that it is "obfuscatory." Abbamonte Jr.'s Supplemental Memorandum (II) at 9 n. 20. We disagree. *Accord United States v. Rantz* No. 85–40036–04, slip op. at 3, 8 (D.Kan. Sept. 30, 1985).

LAW, DCTU database]; *Crooker v. United States Department of Justice,* 497 F.Supp. 500, 503 (D.Conn.1980). Thus, the prison's monitoring and recording procedures are not subject to the restrictions under Title III.[2]

 Defendants also challenge the tape recordings on constitutional grounds. They argue first that the prison's policy of recording their conversations infringes on their First Amendment right to freedom of speech.

We note at the outset that "the legitimate governmental interest in order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez,* 416 U.S. 396, 412–13, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974). In this context, the First Amendment imposes two requirements. Restrictions on inmate communication must further a substantial governmental interest that is not itself related to the suppression of speech. *Id.* at 413, 94 S.Ct. at 1811. In addition, the restrictions may be only as broad as is necessary to protect the particular governmental interest. *Id.*

The Lewisburg procedures for interception of telephone conversations meet these requirements. The procedures unquestionably further "one or more of the substantial governmental interests of security, order, and rehabilitation." *Id.* And we are not prepared to say that the procedures are not "generally necessary," *id.* at 414, 94 S.Ct. at 1811, to the protection of these interests. *See* Affidavit of Michael R. Bromwich, Sept. 2, 1986, at 2–6, ¶¶ 5–13. For we accord, as we must, "wide-ranging deference" to the Lewisburg prison administrators, whose expert judgment it is that the interception procedures are necessary for prison order and security. *See Bell v.*

*Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). We find no First Amendment violation here.

 Defendants also claim that the recording of their conversations deprived them of the Fourth Amendment freedom from unreasonable search and seizure.

To invoke the Fourth Amendment's protection, defendants must at the threshold establish a legitimate expectation of privacy in the area searched or the subject matter seized. *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967)). As a general rule, a prisoner's expectation of privacy is *per se* illegitimate. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984). "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 3201 (footnote omitted); *United States v. Cohen,* 796 F.2d 20, 22 (2d Cir.1986).

Defendants contend, however, that the United States Supreme Court's holding in *Hudson v. Palmer, supra,* is confined to the prisoner's cell itself. We think it unlikely that the Court would sanction such a restriction on the close and continual surveillance of inmates. In any event, the law of this Circuit does not. *See Christman v. Skinner,* 468 F.2d 723, 726 (2d Cir.1972) (monitoring of inmate's conversations did not violate his right to privacy).

A different result might be appropriate if the recordings were not integrally and continuously a means for prison officials to maintain order and security at Lewisburg.

**2.** The inmate defendants unpersuasively urge that they received no warning other than the notice posted on the telephones, *see supra* note 1. But by using the telephones they did exactly what the posted notices warned of: They consented to the interception of their calls. *See United States v. Rantz, supra,* slip op. at 8. Even apart from the legality under Title III of the prison's telephone monitoring policy, this act of consent exempted the interception of their calls

from the Act. 18 U.S.C. § 2511(2)(c); *see United States v. Rantz, supra,* slip op. at 8; S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 *U.S.Code Cong. & Admin.News* 2112, 2182 ("Consent may be express or implied."). *But cf. Campiti v. Walonis,* 611 F.2d 387, 393–94 (1st Cir.1979) (no implied consent found under the circumstances of the case); *Crooker v. United States Department of Justice, supra,* 497 F.Supp. at 502–03 (same).

*Cf. United States v. Cohen, supra,* 796 F.2d at 24 (search of a pretrial detainee's cell, initiated by a prosecutor for the sole purpose of gathering information for a superseding indictment, violates the Fourth Amendment). But prison-initiated searches and surveillance stand on firm Fourth Amendment ground. *Id.*

■ Defendants also argue that the recording of their conversations deprived them of their right to assistance of counsel. The Sixth Amendment right to counsel attaches upon "the initiation of adversary judicial proceedings." *Michigan v. Jackson,* —— U.S. ——, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). Adversary judicial proceedings began in this case with the filing of the indictment on January 21, 1986, well after the recording of the conversations at issue here. Thus, no violation of their right to counsel was possible at that time.

Defendants' Fifth and Eighth Amendment arguments are meritless and deserve no discussion.

■ Defendants additionally argue that regulations authorizing the monitoring of prisoners' telephone conversations, 28 C.F.R. §§ 540.100, 540.101, are invalid as overbroad, and alternatively that if the regulations are valid the procedures at Lewisburg do not comply with them.

We have already noted in considering defendants' First Amendment claim that the Lewisburg procedures are not overbroad. We owe to the Bureau of Prisons the same wide-ranging deference that we pay to the prison officials at Lewisburg because, among other things, "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell v. Wolfish, supra,* 441 U.S. at 548, 99 S.Ct. at 1878.

■ With this consideration in mind, the court has no hesitation in finding the regulations valid. Defendants suggest, however, that the Lewisburg procedures

fail to comply with the regulations because they include recording as well as monitoring of conversations, while the regulations facially mandate only monitoring. There is no real difference to this distinction. No doubt recording like monitoring is integral to the preservation of security and orderly management at Lewisburg. The warden at Lewisburg could, in the exercise of his expert judgment, justifiably provide for recording as a procedure enabling monitoring of telephone conversations.[3] 28 C.F.R. § 540.101; *see Bell v. Wolfish, supra,* 441 U.S. at 547–48, 99 S.Ct. at 1878. Thus, the Lewisburg procedures as well as the regulations themselves are valid.

■ Defendants argue that Lewisburg's monitoring and recording procedures violated the rights of free persons conversing over the telephone with them.

It is difficult to believe that the considerations that justify monitoring and recording of a prisoner's utterances could somehow not apply at the other end of telephone line. The rights of free persons may well at times be implicated and stand or fall with the rights of prisoners. *See, e.g., Procunier v. Martinez, supra,* 416 U.S. at 408–09, 94 S.Ct. at 1808–09 (First Amendment right of expression of persons corresponding with prisoners); *Christman v. Skinner, supra,* 468 F.2d at 726 (Fourth Amendment right to privacy of persons visiting prisoner). We fail to understand, however, what significance the incarcerated defendants attach to the rights of free persons in this case. Even assuming that a violation of a free person's right could plausibly be argued here, the prisoner defendants simply do not have standing to complain of such a violation. *See United States v. Salvucci,* 448 U.S. 83, 86, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980) ("it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he ... establish, that he himself

---

**3.** Our finding applies with equal force to defendants' additional contention that the prison's

procedures were arbitrary and capricious.

was the victim of an invasion of privacy" [citation omitted] ); *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2443, 65 L.Ed.2d 468 (1980) (court may not exclude evidence under the Fourth Amendment unless the "unlawful search or seizure violated the defendant's own constitutional rights").

Finally, defendants argue that the government should be precluded from introducing the tape recordings into evidence (or that the indictment should be dismissed) because some of the recordings have not been preserved. As noted above, correctional officers routinely reused tapes by recording over and erasing previous conversations. On October 24, 1985, the government subpoenaed all tape recordings of conversations for the period from January 1, 1985, through the date of the subpoena. Prison officials complied with the subpoena by producing 219 tapes from the specified period and approximately 34 tapes from other time periods. An undetermined number of tape recordings from the period covered by the subpoena were not produced because Lewisburg correctional officers had recorded over and erased them. Affidavit of Michael R. Bromwich, Sept. 2, 1986 at 10–12, ¶¶ 23–29.

An agent of the DEA provided the Lewisburg officials with blank tapes to replace those subpoenaed. However, when the replacement tapes proved defective, a DEA agent involved in the prosecution of this case returned for re-use approximately 27 of the 34 tapes produced under but not covered by the subpoena. Many or all of these tapes have apparently also been recorded over and erased. *Id.*

The government concedes that at least some of the lost recordings were subject to discovery. Because some of the recorded conversations have been obliterated and cannot be retrieved, defendants seek the sanction of dismissal of the indictment or suppression of all the taped conversations at trial.

■ Whether sanctions are appropriate as a response to the loss or destruction of discoverable evidence depends on a case-by-case examination of the government's culpability for the loss, as balanced against "a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." *United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir.1980). Where the government's loss of a tape recording is merely inadvertent or negligent, sanctions are not appropriate unless defendants are "so greatly prejudiced by the unavailability of the recording at the trial as to require" them. *United States v. Miranda,* 526 F.2d 1319, 1328 (2d Cir.1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). By contrast, where the loss is deliberate or in bad faith, sanctions are proper except where "the Government can bear the heavy burden of demonstrating that no prejudice resulted to defendant[s]." *United States v. Grammatikos, supra,* 633 F.2d at 1020.

Here, two sets of tape recordings were lost and the circumstances surrounding each set are different. The first set includes those recordings that were destroyed prior to the issuance of the subpoena of October 24, 1985, because officials at Lewisburg reused the tapes. As to this loss the government's culpability was slight. It did not know of the existence of Lewisburg's tape recording system until the late spring of 1985. It was not apprised of the potential destruction of discoverable evidence until shortly before it subpoenaed the tapes. At worst, the government did not act as promptly as it should have.

On the other hand, a second set of recordings consisted of the approximately 27 tapes outside the scope of the subpoena. It is too late in the day for the government to argue, as it does, that it is free from culpability for the destruction of this set of recordings. The Court of Appeals for this Circuit has made more than clear its unwillingness to tolerate the government's inattention to its duty to preserve discoverable evidence. *See United States v. Henriquez,* 731 F.2d 131, 137–38 (2d Cir.1984); *United*

*States v. Bufalino,* 576 F.2d 446, 449–50 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). The DEA agent who returned these tapes did so knowing very well that they would be reused and erased. Although there is no evidence that the agent intended the destruction of *discoverable* evidence—as he relied on the fact that the subpoena did not cover these tape recordings—his failure to preserve the tapes constituted serious negligence.

Having found that the government acted negligently in each case but not deliberately or in bad faith, a realistic appraisal of the significance of the recordings under the circumstances of this case must be made. Here, the task is easier, for it is most difficult for us to imagine how the lost recordings could be helpful to defendants. They are charged with an ongoing conspiracy and the possession and distribution of narcotics, and Abbamonte in particular is charged with conducting a continuing criminal enterprise. A great number of recorded conversations from the approximately 220 remaining tapes are highly inculpatory to defendants. The sheer volume of incriminating conversations from both before and after the periods covered by existing recordings makes it most doubtful that defendants have suffered any significant prejudice from the loss of some tapes.

This "pragmatic balancing approach" leads to the conclusion that notwithstanding the government's serious negligence in one instance, as well as slight negligence in another, the absence of significant prejudice to defendants makes this case an inappropriate one for sanctions. *See United States v. Grammatikos, supra,* 633 F.2d at 1020–22. Defendants' motion is denied.

For the foregoing reasons, the court concludes that the recordings of defendants' telephone conversations were lawfully produced and that their suppression would be improper. Defendants' motions for their suppression are, therefore, denied.

As indicated at the outset, all motions not discussed are baseless, supported solely on conclusory allegations, or are otherwise without merit. Accordingly, as also indicated, all motions not explicitly addressed are summarily denied.

IT IS SO ORDERED.

### ADDENDUM

Originally all defendants' motions were to be filed on July 25, 1986, and a response by the government was due August 1. Subsequently both defendants' and the government's time was enlarged. However, defendants' time was not extended beyond August 20, 1986. The government's response to defendants' motions was filed on September 2, 1986.

Vasta filed a motion received in chambers on October 8 for a bill of particulars. The motion was filed too late and will not be considered by the court.