UNITED STATES of America,

v.

Carleton MONTGOMERY, Arthur Prioleau, Quintin Prioleau, and Richard Willoughby, Defendants.

No. SSS87 Cr. 594 (MEL).

United States District Court, S.D. New York.

Dec. 18, 1987.

Balsam Felber & Connuch, New York City, for defendant Arthur Prioleau; Daniel M. Felber, of counsel.

Wiseman & Kinigstein, New York City, for defendant Quintin Prioleau; Michael Wiseman, of counsel.

Louis R. Aidala, New York City, for defendant Richard Willoughby.

LASKER, District Judge.

Defendants Richard Willoughby, Quintin Prioleau, Carleton Montgomery, and Arthur Prioleau are charged under 18 U.S.C. § 371 with conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1503 and 1512. In addition, Quintin Prioleau is charged with violation of 18 U.S.C. §§ 1503 and 1512(b)(2)(D); Arthur Prioleau also faces counts arising under 18 U.S.C. §§ 1512(b)(2)(A) and 1512(b)(3).

In early 1987, Montgomery, Arthur Prioleau and Quintin Prioleau were arrested and charged with a 1982 armed robbery of the City College branch of Chemical Bank; all three were held at the Metropolitan Correctional Center ("MCC"). On June 11, Sabrina Johnson visited Arthur Prioleau, a former boyfriend, at the MCC. During the conversation, which Johnson taped at the government's request, Arthur Prioleau allegedly intimidated her and threatened her with physical harm were she to testify as a government witness. On June 22, 1987, two weeks before the scheduled commencement of the robbery trial, Quintin Prioleau, with Montgomery standing beside him, called Willoughby from a pay telephone in the MCC. The call, which was intercepted and taped, is alleged to reveal the plans of the defendants to prevent a witness by intimidation or physical force from testifying at an armed robbery trial. Soon after these events these four defendants were indicted for federal conspiracy and obstruction of justice.

Rudolph W. Guiliano, U.S. Atty., New York City, for plaintiff; Joan McPhee, Asst. U.S. Atty., of counsel.

David E. Liebman, New York City, for defendant Carleton Montgomery.

Defendants,[1] in separate motions, have moved to dismiss the indictment, or alternatively to suppress the tapes, on the ground that the taping of the conversations violat-

---

1. Although all defendants do not join in each of these motions, the defendants making each request are specified in the portion of this opinion addressing the particular point rather than in the summary.

ed their statutory and constitutional rights; to dismiss the indictment, or in the alternative to dismiss the counts brought under § 1503, arguing that § 1503 has been superceded by § 1512; for severance; and for in limine rulings redacting portions of the taped conversations.[2] All of the motions are denied.

## I.

Defendants Richard Willoughby, Quintin Prioleau and Carleton Montgomery move under Fed.R.Crim.Pro. 12(b)(3) to suppress the tape-recording of a telephone conversation between Prioleau and Willoughby and a subsequent conversation in person between Prioleau and Montgomery. Defendants argue that the taping of this telephone conversation violated the wiretapping provisions of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–20 ("Title III") as well as their rights under the Fourth and Fifth Amendments of the United States Constitution. The motion is denied.

### A. Facts

Early in 1987, Quintin Prioleau, Arthur Prioleau and Carleton Montgomery were arrested on several counts of armed bank robbery and conspiracy to commit armed bank robbery and were detained at the MCC pending trial. On June 22, 1987, two weeks before the commencement of trial on the armed bank robbery charges, Prioleau made a call from the MCC to Richard Willoughby, who was not charged with participation in the bank robbery or in detention. During this telephone conversation, Prioleau and Willoughby made statements which, the government argues, provide evidence of a conspiracy to intimidate and injure or murder one Patricia White who was scheduled to testify at the upcoming armed bank robbery trial. Directly after this telephone conversation was concluded, but apparently before hanging up the telephone receiver, Quintin Prioleau had a conversation with Carleton Montgomery, who had been standing beside Prioleau during the telephone conversation with Willoughby. Prioleau explained to Montgomery the substance of his conversation with Willoughby.

Both the Prioleau–Willoughby telephone conversation and the subsequent face-to-face conversation between Prioleau and Montgomery were monitored and tape-recorded by an MCC correction officer. Under a taping system initiated in mid–1986, the MCC tapes all telephone calls placed from the pay phones made available to MCC inmates.[3] The taping system runs automatically, even when the telephones are not in use. All calls from the phones can also be monitored by prison officials, and two correction officers monitor telephone lines on a random basis as part of their regular duties. These corrections officers are responsible for reporting any suspicious conversations which they monitor.

On this occasion, the correction officer who monitored the Prioleau–Willoughby call contacted the floor officer stationed in the vicinity of the telephone from which the call had been placed and asked the identity of the inmate using the phone. The floor

2. The following decisions have already been announced on additional motions. Defendant Willoughby's motion to suppress statements made to FBI agents was denied on the record after a hearing. Similarly, the motion to preclude use of the two taped conversations on the grounds that they were inaudible was denied in large part in a decision issued on November 18, 1987. Arthur Prioleau and Carleton Montgomery's motion to compel the government to disclose material covered by 18 U.S.C. 3500 two weeks prior to trial was denied orally on December 9, 1987, but the government was requested to provide the material as soon as possible and no later than the night prior to a particular witness' testimony.

Arthur Prioleau's motion to compel the government to disclose similar or extrinsic act evidence is moot, in light of the government's representation that it has informed Prioleau that it does not plan to introduce evidence of such acts of Prioleau in its case in chief and that it will notify the court and counsel should its position change. A decision was rendered on the record on the defendants' motion to redact portions of the tape-recorded conversation pursuant to Rules 403 and 404 of the Federal Rules of Evidence in a conference of December 16, 1987.

3. All facts concerning the MCC telephone taping and monitoring policy are drawn from the Affidavit of Joan McPhee (Sept. 10, 1987).

officer reported that the caller was Quintin Prioleau and that Carleton Montgomery was standing beside Prioleau during the course of the call. The monitoring officer then contacted the Special Assistant to the Assistant Warden and informed him of the substance of the call and the identity of the caller.

In addition to the public notice of this telephone monitoring published in the Code of Federal Regulations, 28 C.F.R. § 540.101 (1987), MCC inmates receive notice that the telephones are taped and monitored in three ways. First, upon arriving at MCC, each inmate must attend an admission and orientation lecture at which the monitoring and taping system is discussed. In that lecture, inmates are told that all of their calls are taped except properly placed calls to an attorney, and that officials randomly conduct live monitoring of their calls. Second, upon admission to the MCC, inmates are also given a form which explains the monitoring and taping system. The form states:

> The Bureau of Prisons reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. An inmate's use of institutional telephones constitutes consent to the monitoring. A properly placed phone call to an attorney is not monitored.

*See* McPhee Affidavit at Exhibit A (copy of form provided to and signed by Quintin Prioleau on March 5, 1987). After reviewing the form, inmates are requested to sign a statement stating in part: "I understand that telephone calls I make from institution telephones may be monitored and recorded." Quintin Prioleau signed this statement on March 5, 1987. *Id.* Finally, posted above each telephone is a notice stating in English and Spanish that: "The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes

consent to this monitoring...." McPhee Affidavit at ¶ 18.

### B. *Title III and Fourth Amendment Claims*

Defendants argue that the taping of the Prioleau–Willoughby conversation violated the provisions of Title III governing wiretapping and violated their rights under the Fourth Amendment. On the Title III issue, the government argues first, that Title III does not apply to communications within a prison, and second, that if it does apply, the MCC taping and monitoring system falls within two exceptions to the Title III warrant requirement: the exception applicable to wiretapping by a "law enforcement officer in the ordinary course of his duties," 18 U.S.C. § 2510(5)(a)(ii), and the exception applicable where "one of the parties to the communication has given prior consent to such interception," 18 U.S.C. § 2511(2)(c). The government also contends that under the facts of this case Prioleau, Willoughby and Montgomery had no justifiable expectation of privacy as to the telephone call which could trigger a violation of the Fourth Amendment.

These issues are largely controlled by *United States v. Amen,* 831 F.2d 373 (2d Cir.1987), *aff'g United States v. Vasta,* 649 F.Supp. 974 (S.D.N.Y.1986), a recent decision of the court of appeals for this circuit which was issued after this motion was briefed. The appellants in *Amen,* making the same Title III and Fourth Amendment arguments advanced by defendants here, argued that the district court erred in failing to suppress evidence of tape-recorded telephone conversations which they had conducted while inmates at the federal penitentiary in Lewisburg, Pennsylvania ("Lewisburg"). Lewisburg employs a system of regular taping and random monitoring of inmate telephone calls [4] which from the facts of *Amen* and *Vasta* appears to be substantially similar to that used at MCC. Lewisburg also notifies inmates of the taping and monitoring procedures in the same ways as does MCC.

---

**4.** *See Vasta,* 649 F.Supp. at 989.

The *Amen* court rejected appellants' arguments both as to Title III and the Fourth Amendment. Although the court found that "Title III clearly applies to prison monitoring," *Amen*, 831 F.2d at 378, it decided that "the monitoring in this case fell within the consent exception to Title III," *id.* Because the appellants had notice of the telephone monitoring and taping system through the regulations published in the Code of Federal Regulations, the Lewisburg admission and orientation lecture, and notices placed on all Lewisburg inmate telephones, the *Amen* court concluded that "the two defendants had notice of the interception system and ... their use of the telephones therefore constituted implied consent to the monitoring." *Id.* at 379. Considering the appellants' Fourth Amendment claims in the light of recent Supreme Court decisions on the issue, the court of appeals concluded that:

> As the Supreme Court construes the Fourth Amendment, prison inmates have no reasonable expectation of privacy. In the prison context the reasonableness of a search is directly related to legitimate concerns for institutional security. If security concerns can justify strip and body-cavity searches and wholly random cell searches, then surely it is reasonable to monitor prisoners' telephone conversations, particularly where they are told that the conversations are being monitored.

*Id.* at 379–80 (citations omitted).

■ In the present case, defendants' Title III claims are squarely governed by *Amen*. The Prioleau–Willoughby telephone conversation was taped and monitored under the same prison policy considered in *Amen* and Prioleau had as much notice of the monitoring as the *Amen* appellants. Hence, defendant's Title III claim must be rejected because Prioleau's use of the telephone after ample notice of the interception system constituted implied consent to the monitoring under 18 U.S.C. § 2511(2)(c). *See Amen*, 831 F.2d at 379.

Arguably, however, *Amen* is not squarely on point as to the Fourth Amendment issues presented in this case because the *Amen* appellants were convicted and sentenced inmates incarcerated at Lewisburg[5] whereas Prioleau had pre-trial detainee status at the MCC with regard to the armed bank robbery charges.[6] Although the Supreme Court has ruled in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) that a convicted prisoner has no reasonable expectation of privacy in his prison cell, the court of appeals for this circuit has refused to interpret *Hudson* as a broad ruling that "a pre-trial detainee retains no Fourth Amendment rights, regardless of the circumstances underlying the search." *United States v. Cohen*, 796 F.2d 20, 23 (2d Cir.1986) (holding that pre-trial detainees retain a Fourth Amendment expectation of privacy sufficient to challenge cell searches initiated by the prosecution but not cell searches conducted by prison authorities for security reasons), *cert. denied*, —— U.S. ——, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

■ Assuming that Prioleau retained some measure of Fourth Amendment protection under these circumstances, "the need for the particular search [must be balanced] against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Having done so, I conclude that the taping and monitoring of the Prioleau–Willoughby conversation was a reasonable seizure, given the

---

5. Although the *Amen* court did not expressly describe the status of the *Amen* appellants at Lewisburg, it is evident from the fact statement as well as the legal discussion that appellants were convicted prisoners rather than pre-trial detainees.

6. The government argues that in deciding Prioleau's Fourth Amendment claims the court should consider that when the telephone conversation occurred, Prioleau, although awaiting trial on the armed bank robbery charges, was a convicted and sentenced prisoner on a variety of serious state court charges. *See* Government's Memorandum of Law in Opposition to Defendants' Pre–Trial Motions at 23–25 (September 11, 1987). Because Prioleau's argument is rejected even assuming that he was a pre-trial detainee, it is not necessary to address the issue whether the distinction in status argued by the government is determinative.

ample notice to Prioleau of the monitoring. Although the taping and monitoring clearly impinge on the privacy of MCC inmates, the notice provision takes away much of the unfair element of surprise, and the government has made a sufficient showing that the interception system is a necessary and effective tool in maintaining internal security, *see* McPhee Affidavit at ¶¶ 10–13. For these reasons, Prioleau's Fourth Amendment claims must be rejected. *See Lee v. Carlson,* 645 F.Supp. 1430, 1438 (S.D.N.Y.1986) (Weinfeld, J.) (noting, in rejecting detainee's § 1983 claim of improper telephone monitoring at MCC, that "[t]he Fourth Amendment does not prohibit monitoring of prisoners' telephone conversations done in order to preserve the security and orderly management of the institution and to protect the public").

A few brief additional points must be made with regard to Montgomery's and Willoughby's Fourth Amendment claims. Montgomery's Fourth Amendment claim arises from the taping of Montgomery's face-to-face conversation with Prioleau which took place directly after the conclusion of the Prioleau–Willoughby telephone conversation. Based on the transcript made from the recording, it appears that this conversation took place and was recorded while Montgomery was standing next to and talking to Prioleau while Prioleau was dialing another number on the telephone. Under these circumstances, Montgomery, who had as much notice as Prioleau that the MCC telephones were monitored, has no stronger Fourth Amendment claim than Prioleau.

█ Willoughby, who was not incarcerated when he participated in the recorded telephone conversation initiated by Prioleau from the MCC, has a slightly different and arguably stronger Fourth Amendment claim. However, non-inmates as well as inmates are on notice through publication of the Code of Federal Regulations that prison officials have the authority to monitor inmates' calls to outside the institution,

*see* 28 C.F.R. § 540.101, and "[i]t is difficult to believe that the considerations that justify monitoring and recording of a prisoner's utterances could somehow not apply at the other end of [the] telephone line." *Vasta,* 649 F.Supp. at 991. Weighing the legitimate security interests of the MCC discussed above against Willoughby's privacy interest, I conclude that the taping and monitoring of the conversation did not violate Willoughby's Fourth Amendment rights.[7]

### C. *Fifth Amendment Claims*

█ Defendants argue that the monitoring and taping of the conversations at issue here violated their Fifth Amendment rights as pretrial detainees to be free of restrictions amounting to punishment under the test first articulated in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This argument is without merit. In *Bell,* the Supreme Court outlined the principles to be applied in evaluating the constitutionality of conditions of pretrial detention. Observing that "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose," 441 U.S. at 538, 99 S.Ct. at 1873 (citation omitted), the court concluded:

[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539, 99 S.Ct. at 1874 (footnote and citation omitted); *accord Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984). As dis-

---

7. Indeed, the Supreme Court has indicated in *dicta* that a visitor to a jail has no legitimate expectation of privacy in his conversations with a detainee, *see Lanza v. New York,* 370 U.S. 139,

142–44, 82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384 (1962), and there is no reason why a person conversing over the telephone with a detainee should have any more heightened expectation.

cussed above, the MCC taping and monitoring system is clearly related to the legitimate governmental objective of institutional security and cannot be regarded as punishment in violation of the Fifth Amendment.

## II.

Defendant Arthur Prioleau has moved to dismiss the indictment against him, or alternatively to suppress the tape of his conversation with Sabrina Johnson, on the grounds that the taping violated his Fifth and Sixth Amendment rights.

## A.

First, Prioleau argues that his statements to Johnson were elicited in violation of his Fifth Amendment rights because he was not given *Miranda* warnings although he was subject to custodial interrogation that could lead to a criminal prosecution. For this argument, Prioleau relies on *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), in which the court held that defendant must be given *Miranda* warnings prior to questioning by IRS agents—about charges other than those for which defendant was incarcerated—because the investigations could lead to criminal prosecution and defendant was in custody. Prioleau maintains that *Miranda* applies even though the interrogation was "surreptitious."[8] However, the decisions which Prioleau cites for support, which hold that statements obtained by friend-informants were inadmissible at trial because the statements were obtained in violation of defendant's constitutional rights, were decided on Sixth Amendment grounds.[9] *See Maine v. Moulton*, 474 U.S. 159, 176–77, 106 S.Ct. 477, 487–88, 88 L.Ed.2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980); *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *Spano v. United States*, 360

U.S. 315, 323, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (1959); *but see Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 2630, 91 L.Ed. 2d 364 (1986).

The government argues that Prioleau's motion cannot succeed because the defendant was not compelled to speak, but instead conversed voluntarily with Johnson. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1964) (holding that procedural safeguards are required prior to custodial interrogation but not prior to voluntary statements). *See also Minnesota v. Murphy*, 465 U.S. 420, 433–34, 104 S.Ct. 1136, 1145–46, 79 L.Ed.2d 409 (1984) (holding that incriminating statements to probation officer were not compelled despite absence of *Miranda* warnings); *Hoffa v. United States*, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414–15, 17 L.Ed. 2d 374 (1966) (holding that statements to government informant were voluntary). These cases, though, are distinguishable because the defendants were not incarcerated.

The case at hand, which is not fully addressed by the case law cited by either party, falls between two well-established bodies of law. First, beginning with *Miranda*, the courts have construed the Fifth Amendment to require that a defendant in custody be given *Miranda* warnings before a government officer may commence questioning. *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Rhode Island v. Innis*, 446 U.S. 291 (1980); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964). Second, an individual's constitutional rights are not violated when a government informant questions or solicits information while that person is not in custody. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733

---

**8.** Although Johnson was not a police officer, there is no dispute that she had, at the government's request, agreed to record her visit. Letter from Assistant United States Attorney Joan McPhee to Judge Sprizzo (June 24, 1987), Exhibit A to Affidavit of Daniel Felber.

**9.** Although not conclusive, it is worth noting that these cases, which are factually similar to the one at hand, did not involve Fifth Amendment challenges to the constitutionality of the statements.

(1979); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413–14, 17 L.Ed.2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

Clearly, had Prioleau had this conversation outside the prison walls, there would be no constitutional violation, because *Miranda* only applies when the suspect is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612. The question then is whether Prioleau's statements should be inadmissible solely because the defendant was incarcerated at the time of the conversation. I conclude, using the analysis of the cases in which the courts have considered whether a defendant can be characterized to have been in custody and thus whether *Miranda* is applicable, that *Miranda* warnings were not constitutionally required in the case at hand. *See Berkemer v. McCarty*, 468 U.S. 420, 435–42, 104 S.Ct. 3138, 3147–52, 82 L.Ed.2d 317 (1984) (holding admissible statements made to police by defendant who was stopped for a traffic violation, because suspect had the expectation he would be able to leave and the interaction was public); *Minnesota v. Murphy*, 465 U.S. 420, 427–34, 104 S.Ct. 1136, 1142–46, 79 L.Ed.2d 409 (1984) (holding that defendant, when questioned by his probation officer, was not in custody); *Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977) (holding that confession of defendant who came to police station at officer's request was admissible, despite lack of *Miranda* warnings, because he came to the station voluntarily and was told he was not under arrest); *Beckwith v. United States*, 425 U.S. 341, 344–48, 96 S.Ct. 1612, 1615–17, 48 L.Ed.2d 1 (1976) (holding that *Miranda* warnings were not required because interview by IRS agents for criminal investigation was not custodial); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that defendant's statements, made to four officers while in his bedroom without *Miranda* warnings, were obtained in violation of the Fifth Amendment because defendant was under arrest

and not free to leave); *Mathis v. United States*, 391 U.S. 1, 3–5, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381 (1968) (holding that *Miranda* requirements are applicable to interviews by IRS agents of a defendant in custody). Looking at the factors that motivate the decision in *Miranda* and the above cases—whether the statements were the product of an inherently compulsive surrounding and whether the defendant was free to leave—I conclude that Prioleau's statements were voluntary. Prioleau was not compelled to speak with Johnson and, because Johnson was not a government officer, Prioleau was not subject to the pressure and compulsion of police interrogation. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (holding Miranda warnings necessary when defendant is subject to custodial interrogation, meaning "questioning by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom in any significant way") (emphasis added).

■ The facts of this case appear most analogous to those of *Oregon v. Mathiason*, in which the court found voluntary the statements of the defendant who, upon coming to the station house at the request of a police officer, was questioned about a theft while in a small room, not visible to the public, with only the officer present. The court, in reaching its decision, emphasized that the defendant's freedom to depart was not restricted. Prioleau's conversation with Johnson was similarly voluntary. Although Prioleau was incarcerated, he had requested Johnson's visit and he was free to leave the conversation at any time. In fact, Prioleau's conversation with Johnson seems fraught with fewer of the coercive factors that concerned the *Miranda* court than were present in *Minnesota v. Murphy*, when it was held that *Miranda* warnings were not required prior to questioning of a defendant by the probation officer to whom he had to report regularly. Although the institution was an unfamiliar setting, *Murphy*, 465 U.S. at 433, 104 S.Ct. at 1145, Prioleau was speaking with his former girlfriend. He was not confronted with an officer of the court or

an IRS agent, as in *Mathiason*, authority figures whose presence would be more likely to create the "police-dominated atmosphere" that tends to create the compelling pressures, protection against which the *Miranda* court sought to create. *Miranda*, 384 U.S. at 445, 86 S.Ct. at 1612–13. Because Johnson was not a government officer, there was not complete unfamiliarity with the examiner and environs, *Miranda*, 384 U.S. at 457, 86 S.Ct. at 1618–19, there could not be insinuations that the interrogation would continue until a confession was obtained, *Murphy*, 465 U.S. at 433, 104 S.Ct. at 1145, and there could be no pressure from the "aura of authority surrounding an armed police officer," *Berkemer v. McCarty*, 468 U.S. at 438, 104 S.Ct. at 3149.

Although Prioleau could argue that he was deceived by Johnson, because her role as a government agent was not known to him, that alone does not constitute a violation of his rights. *See Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. 2d 374 (neither defendant's Fourth, Fifth, or Sixth Amendment rights were violated when statements obtained by a government informant were used at trial). The mere fact that Prioleau was incarcerated does not make his statements with Johnson the product of coercion.

In sum, because the questioning was not initiated by law enforcement officers and Prioleau was free to leave the conversation with Johnson, his Fifth Amendment rights were not violated. *Cf. United States v. Wilson*, 565 F.Supp. 1416, 1437 (S.D.N.Y. 1983) (holding that defendant's Fifth Amendment rights were not violated when, while incarcerated at MCC, he made statements to a fellow prisoner/government informant about plans to kill a witness absent *Miranda* warnings). Prioleau's motion to dismiss the indictment or to suppress the tape on Fifth Amendment grounds is denied.

## B.

Second, Prioleau moves to dismiss the indictment or to suppress the tape because, he argues, his post-indictment statements to Johnson were obtained in violation of his Sixth Amendment right to counsel. Although *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (holding that statements concerning a robbery made by a defendant, while under indictment and in custody on charges of armed bank robbery, to a cellmate who was a paid government informant, violated defendant's Sixth Amendment rights because the government had deliberately created a situation likely to induce defendant to make incriminating statements) can be construed to support the defendant's argument, the Supreme Court has interpreted that decision narrowly. In *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the court, although reaffirming its holding in *Henry*, remarked:

> [L]aw enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to *pending* charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused.... On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

474 U.S. at 179–80, 106 S.Ct. at 489–90 (footnote omitted) (emphasis added). In a footnote, the Court also stated that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment has not yet attached, are, of course, admissible at a trial of those offenses." 474 U.S. at 180, n. 16, 106 S.Ct. at 490 n. 16. *See also Mealer v. Jones*, 741 F.2d 1451, 1453 (2d Cir.1984) ("[W]here the post-indictment statements elicited in the absence of counsel concern a new (i.e., as yet uncharged) crime, those statements are admissible in a subsequent trial on the new crime."), *cert. denied*, 471 U.S. 1006, 105 S.Ct. 1871, 85 L.Ed.2d 164 (1985); *United States v. Hinton*, 543 F.2d 1002, 1015 (2d Cir.1976) (hold-

ing that defendant's right to counsel was not violated since statements deliberately elicited in counsel's absence did not concern crime for which he was indicted), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), 429 U.S. 1051, 97 S.Ct. 796, 429 U.S. 1066, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

In this case, there is no dispute that Prioleau's Sixth Amendment rights had attached as to the charge of armed bank robbery. However, because Prioleau had not been indicted for obstruction of justice, the charge for which the government seeks to use the recorded conversation, his Sixth Amendment rights were not violated. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (holding that right to counsel attaches post-indictment). Accordingly, the motion to dismiss the indictment and to suppress the tape on Sixth Amendment grounds is denied.

### III.

Defendants Quintin and Arthur Prioleau, and Montgomery, have moved to dismiss the indictment or, in the alternative, to dismiss counts arising under 18 U.S.C. § 1503, based on the ground that § 1503 has been superceded by § 1512. In 1982, Congress amended § 1503, removing all references to "witnesses,"[10] and enacted § 1512 to protect witnesses.[11] Defendants contend that the deletion of all references to witness from § 1503 reflects Congress' intent that all charges of witness harassment, intimidation, and influence be brought under § 1512. The government, in response, maintains that § 1503 proscribes forms of witness tampering not covered by the narrow language of § 1512. Defendants' motion is denied without prejudice to renewal at the end of the government's case.

Defendants rely, for support for their construction of § 1503, on *United States v. Hernandez*, 730 F.2d 895 (2d Cir.1984), in which the court held that defendant could not properly be convicted under § 1503 with threatening a witness in order to obtain documentary evidence. The *Hernan-*

**10.** The text of § 1503, as amended in 1982, follows, the brackets indicating text that was deleted at the time:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede [any witness in any court of the United States or before any United States commissioner or other committing magistrate, or] any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or [injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or] injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs or impedes ... the due administration of justice shall be fined not more than $5,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1503 (1982).

**11.** Section 1512 states, in relevant part:

(b) Whoever knowingly uses intimidation or physical force, or threatens another person or attempts to do so, or engages in misleading conduct toward another person with intent to—

(1) influence the testimony of any person in an official proceeding;

(2) cause or induce any person—to

(A) withhold testimony ... from an official proceeding

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

(c) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

\* \* \* \* \* \*

or attempts to do so, shall be fined not more than $25,000 or imprisoned not more than one year, or both.
18 U.S.C. § 1512 (1986).

*dez* court rejected arguments that § 1503's residual clause, prohibiting obstruction of justice, covers witness *harassment,* stating that "by enacting the Victim and Witness Protection Act in 1982, Congress intended that *intimidation* and *harassment* of witness should thenceforth be prosecuted under § 1512 and no longer fall under § 1503." 730 F.2d at 899 (emphasis added). Although the language of the decision includes broad language that "congress affirmatively intended to remove witnesses entirely from the scope of § 1503," 730 F.2d at 898, its holding can be construed narrowly, *see United States v. Beatty,* 587 F.Supp. 1325 (E.D.N.Y.1984).

■ The *Beatty* court, when confronted with the same argument from a defendant who allegedly urged witnesses to give false and misleading testimony, denied defendant's motion to dismiss under § 1503. The court construed *Hernandez* as holding only that charges could not be brought under § 1503 for acts explicitly covered by § 1512. 587 F.Supp. at 1333. Reviewing the legislative history of § 1512, the court found that a residual clause prohibiting a broader range of behavior, including influencing witnesses to give misleading information, was deleted from § 1512, in part because it was considered duplicative of obstruction of justice provisions. *Id.*

> The omission of the general obstruction of justice residual clause from the statute as finally enacted is meaningful in a case such as this where it is not alleged that the witness was forced, threatened or harassed to do or refrain from doing anything and therefore not in need of protection. In that sense the general residual clause was 'beyond the legitimate scope of the witness protection measure.'

*Id.* The purpose of the act—to broaden the protection given witnesses—would be defeated were the court to interpret the act as limiting the scope of § 1503.

The reasoning of the *Beatty* court is persuasive. A contrary construction would be inconsistent with Congress' intent of providing greater protection to witnesses, because it would reward those clever enough to interfere with the integrity of judicial proceedings in a manner not specified in § 1512. Accordingly, as indicated above, the motion is denied without prejudice to renew at the conclusion of the government's case.

IV.

■ Defendant Arthur Prioleau's motion for a *Geaney* hearing, to determine whether there is sufficient independent nonhearsay evidence that the defendant was a member of the alleged conspiracy so that the court can properly decide the admissibility of coconspirators' statements, is premature. Such hearings are properly held at the conclusion of the government's case, not prior to trial. *United States v. Margiotta,* 688 F.2d 108, 136–38 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Mastropieri,* 685 F.2d 776, 786–90 (2d Cir.), *cert. denied,* 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982); *United States v. Cambindo Valencia,* 609 F.2d 603, 630 (2d.Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Wilson,* 565 F.Supp. 1416, 1437 (S.D.N.Y.1983).

■ Finally, defendants Arthur Prioleau and Montgomery have moved for an order severing his individual trial from that of the codefendants pursuant to Fed.R. Crim.P. 8(b) and 14. Defendant Prioleau contends that admission at trial of the recorded conversation of Quintin Prioleau and Richard Willoughby, in which there are references to "Artie", would, to the extent the statements could be used to inculpate Arthur Prioleau, constitute prejudicial error. Montgomery does not state a separate basis for his motion for a severance, but joins in the motion of Prioleau. In response, the government asserts that, because the conversation was held during and in furtherance of the conspiracy, the statements made during that conversation are admissible against all coconspirators and that accordingly a severance is neither nec-

essary nor appropriate. Because the statement of each coconspirator defendant is admissible against the others, Fed.R.Evid. 801(d)(2)(E), the motion for severance is denied at this time;[12] the argument advanced does not show the prejudice required for such a motion to be granted. *Cf. United States v. Serlin,* 538 F.2d 737, 743 n. 5 (7th Cir.1976) (severance was properly denied because there was one overall scheme to defraud implicating the defendants).

The motions are disposed of as indicated above.

It is so ordered.

---

**12.** Decision on a later, oral motion for severance, because of the prejudicial nature of similar act evidence concerning Quintin Prioleau that the government may introduce, is deferred.

When the government offers such evidence, decisions will be made regarding its admissibility and the need for a severance.