UNITED STATES of America,

v.

**Charles MAUSER, Defendant.**

**No. S 89 Cr. 293 (GLG).**

United States District Court,
S.D. New York.

Oct. 25, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., White Plains, N.Y. (Lisa Margaret Smith, Jane Beaver Wilson, of counsel), for U.S.

Lankler Siffert & Wohl, New York City (John S. Siffert, Sheila B. Rathbun, Karen B. Shaer, of counsel), Saltzman & Holloran, New York City (Michael I. Saltzman, of counsel), for defendant.

GOETTEL, District Judge.

## I. *Facts*

In April of 1985, an investigation of William V. Ischie, and William Blackmore was begun by the Internal Revenue Service ("IRS"). The investigation had both criminal and civil elements. On May 6, 1986, the Justice Department agreed to institute a grand jury investigation of the two individuals, relating to possible tax violations.

The investigation primarily focused on a scheme in which Ischie, pastor of the St. German of Alaska Eastern Orthodox Catholic Church and abbot of the St. John of Rila Eastern Orthodox Monastery, solicited donations of "hard to sell" and distressed property to those religious organizations. Property owners expressing interest in making a donation were referred to William Blackmore, a real estate appraiser, who provided inflated appraisals to the donors for the purposes of the donation, and the consequential tax deductions. After donations were made on the basis of the value stated in the appraisal, Ischie usually sold the property at a price far below the value claimed by the property donors. Hundreds of similar donations were identified and reviewed during the course of the investigation. Included among these donations was one by defendant Charles Mauser who donated property located at 4725 Park Avenue, Bronx, New York to St. German in November of 1980. Mauser owned the property in partnership with three others. He and Lew Mauser, his brother, each owned 40% of the property, and Norman Mauser, his nephew, and Marvin Mufson, his son-in-law, each owned 10% of the property.

In 1981, the partnership filed its 1980 partnership tax return which set forth the documentation of the partnership donation of the Park Avenue property to St. German, including a hand-written document summarizing the transaction and a statement placing the value of the property at $235,000. Attached to the return was an appraisal by William H. Blackmore, dated October 29, 1980, declaring the fair market value of 4725 Park Avenue to be $235,000. Mauser's personal 1980 income tax return contained the same documents. Income tax laws and regulations, however, prevented Mauser from taking the entire amount of the deduction on his 1980 return. Rather, the remainder of the charitable deduction was taken over the three subsequent years as a carryover of charitable contribution declared, but not entirely taken, in 1980.

On January 14, 1987, Special Agents John Kees and Alyssa Daversa interviewed Mauser at his office in New Rochelle, New York. The agents told Mauser that they were interviewing him about his donation to the St. German church in the course of a grand jury investigation of Ischie and Blackmore. They explained that he was neither a target nor a subject of that investigation.[1] The agents questioned Mauser about the 1980 donation to St. German, and the subsequent charitable deductions on his 1980, 1981, 1982, and 1983 tax returns. The agents requested, and Mauser produced, documents relating to the donation and the subsequent tax deductions.

At this time, the Government was involved in protracted civil summons enforcement litigation with St. German concerning production of records in various attorneys' possession containing information relevant to any real estate donations and sales conducted by the church and related entities during the years 1980 to 1984. On February 24, 1988, the Second Circuit issued its decision in *St. German of Alaska E. Orthodox Cath. Ch. v. United States*, 840 F.2d 1087 (2d Cir.1988), ordering the attorneys to produce the records.[2]

During 1988, the Government received massive amounts of documents from enforcement actions. These documents included correspondence between Mauser and the church's attorneys, correspondence between Mauser and Ischie, and correspondence between Ischie and the church's attorneys relative to the donation. They also included the closing documents for the donation of the Mauser property, copies of appraisals of the property, and the deed reflecting the donation and the subsequent sales.

On March 1, 1988, the United States Attorney for the Southern District of New

---

1. Indeed, Mauser was not a target or a subject of the investigation at that time.

2. Also at this time, the Government was involved in protracted litigation to enforce grand jury subpoenas issued to the church and related entities requiring production of corporate records. The Court ordered St. German to produce these records.

York requested that the grand jury investigation be expanded to include Charles Mauser. Mauser was indicted on April 14, 1989 [3] for conspiring to defraud the United States in violation of 18 U.S.C. § 371 (1982), and for filing false tax returns for the years 1982 and 1983, in violation of 26 U.S.C. § 7206(1) (1982). Earlier indictments had been returned against Ischie and Blackmore, both of whom pled guilty to related offenses. In addition, related charges were filed in the United States District Court for the Northern District of New York against Paul and Michael Gordon, who were convicted after trial.

The defendant has filed the following motions:

1. A motion to dismiss Counts Two and Three of the indictment on the ground that as a matter of law Mauser's tax returns did not contain any material false statement for which a timely prosecution could be brought;

2. A motion to dismiss Count One of the indictment on the grounds that as a matter of law Mauser made no material false statement to the Government and that the indictment fails to allege the requisite element of deceit under 18 U.S.C. § 371 (1982);

3. A motion to compel disclosure of the grand jury minutes or portions thereof, or alternatively, compelling production of the grand jury minutes or portions thereof, for *in camera* inspection and on inspection, dismissing the indictment;

4. A motion to strike language from the indictment as surplusage;

5. A motion to suppress the statements and documents obtained from Mauser by the Internal Revenue Service Special Agents as well as all leads derived from such statements and documents.

In addition, several discovery motions were filed which were decided by the court at the time of oral argument.

## II. Counts Two and Three

Counts Two and Three of the indictment charge that the defendant

unlawfully, wilfully, and knowingly did subscribe under penalties of perjury to his individual income tax returns (Forms 1040) listed below, which were fraudulent and false as to material matters, to wit: the stated fair market value of property located at 4725 Park Avenue, Bronx, New York donated to the Saint German of Alaska Eastern Orthodox Catholic Church.

Count Two covers returns filed for tax year 1982 and Count Three covers returns filed for tax year 1983. The filing of a false return is a violation of Title 26 U.S.C. § 7206(1) (1982) which provides:

Any person who ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony....

A violation of section 7206(1) is subject to a six year statute of limitations. 26 U.S.C. § 6531(5) (1982). The defendant's 1982 tax return was signed and dated April 12, 1983. It apparently was received by the IRS and, therefore filed, on or about April 15, 1983. Regardless of the date of actual filing, however, the statute of limitations begins to run on the due date, namely, April 15th. 26 U.S.C. § 6513(a) (1982).[4] As an initial matter, therefore, we reject any contention that counts two and three of the indictment are barred by the statute of limitations.[5]

---

3. The indictment was superseded on April 28, 1989. The superseding indictment did not contain any additional charges.

4. 26 U.S.C. § 6531 (1982) includes the directive that "[f]or the purpose of determining the periods of limitation on criminal prosecutions, the rules of section 6513 shall be applicable." That

section provides that "any return filed before the last day prescribed for the filing thereof shall be considered as filed on such last day." 26 U.S.C. § 6513 (1982).

5. The original indictment in this prosecution was filed on April 14, 1989.

■ The defendant contends that he cannot be prosecuted for making a false statement on a tax return because the only return containing a statement as to the charitable contribution and the market value of the property is found on the 1980 partnership and individual tax returns. Consequently, the defendant argues, a charge based on a statement in those returns is time-barred. Neither the 1982 return nor the 1983 return contain any specific reference to, much less a false statement about, the value of the property donated. Rather, they simply report "carry-over from prior years" and state the maximum figure deductible for 1982 and the small remainder for 1983. The manner in which the deduction was carried over into subsequent years was not a matter of choice for the defendant. Because of limitations imposed by the tax regulations on the amount of deductions for charitable donations that may be taken in a single tax year, the defendant was compelled to spread the excess deduction over the following years.[6] The Government now tacitly concedes that the 1982 and 1983 returns do not misstate the fair market value of the property as charged in the indictment but argues that the defendant took false tax deductions which are related to or derived from the prior misstatements of fair market value.[7]

■ The Government has indicated that if this motion is granted it will supersede the indictment at least with respect to tax year 1983 so as to charge the defendant with false charitable deduction carryovers and improper tax deductions. We need not determine whether taking false deductions violates the Internal Revenue Code because that is not what the present indictment charges this defendant with. Rather, he is charged with making a fraudulent and false statement of the fair market value of the property and these returns contain no such statement. Consequently, the motion to dismiss Counts Two and Three of the indictment is granted.[8]

### III.  Count One

■ Count One charges the defendant with a conspiracy to defraud the United States by conducting real estate transactions in such a way as to conceal from the Internal Revenue Service the value of properties donated to the church and thereby obstructing the IRS's ability to determine the defendant's true tax liability. Although the filing of the tax returns for 1982 and 1983 itself may not have been a tax violation, they were clearly overt acts in furtherance of the conspiracy to obtain false charitable deductions occurring within the six years prior to the indictment. The defendant argues, however, that the five-year statute of limitations applicable to the general conspiracy statute, 18 U.S.C. § 371 (1982), should be applied rather than

6. Although the donated property was held by a partnership of four persons, the defendant's partners were not indicted in this matter. Defense counsel theorizes, perhaps correctly, that they were able to take their full deductions prior to their 1982 tax returns so that the statute of limitations prohibits prosecution of them. The defendant's principal partner is deceased and therefore could not be prosecuted even if he shared the same carryover situation. The remaining two partners held only 10% interests and were not active in the management or donation of the property. Indeed, their names are not even on the deed transferring the property.

7. The only case which the Government can cite in support of this approach is *United States v. Kelley*, 864 F.2d 569, 574–75 (7th Cir.1989), *cert. denied*, ── U.S. ──, 110 S.Ct. 55, ── L.Ed.2d ── (1989). That case involved a series of annual depreciation deductions arising from ownership of tax shelter property. It was the taxpayer's intention to spread the deduction over the years involved. The impropriety of the deduction was effected by concealing a collateral contract which rendered all of the planned deductions illegal and which was concealed from the Internal Revenue Service. That taxpayer was convicted of filing false tax returns in violation of 26 U.S.C. § 7206(2) (1982). While the case gives some support to the Government's position, we do not believe it is controlling in this circumstance.

8. Defendant also argues that the original tax return contained no false statements. In essence, the defendant contends that because the tax return stated the value of the property "per appraisal of William H. Blackmore attached," and because that appraisal was attached, no false statement was made. We consider that argument disingenuous and frivolous. Taking a deduction based upon the appraisal constitutes an adoption, at least as reasonably correct, of the value stated therein.

**1000**

the six-year statute generally applicable to tax offenses. 26 U.S.C. § 6531.

Every circuit court that has considered this issue, including the Second Circuit, has held that a conspiracy to impede the Internal Revenue Service in its functions is governed by the six-year statute of limitations. *See United States v. Ingredient Technology Corp.,* 698 F.2d 88, 99 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *United States v. White,* 671 F.2d 1126, 1134 (8th Cir.1982); *United States v. Lowder,* 492 F.2d 953, 955–56 (4th Cir.), *cert. denied,* 419 U.S. 1092, 95 S.Ct. 685, 42 L.Ed.2d 685 (1974). Consequently, we hold that the charge of conspiracy to impede the Internal Revenue Service is timely.

■ The defendant also argues that the indictment is deficient for failure to allege that the interference with the IRS occurred by means of deceit, craft, or trickery. *See Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924) ("To conspire to defraud the United States means ... to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."); *accord United States v. Turkish,* 623 F.2d 769, 771 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *United States v. Klein,* 247 F.2d 908, 916 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). We think the creation of artificial tax deductions by using fraudulent appraisals is certainly an act of deceit and craft falling within the boundaries of the tax laws. Consequently, the motion to dismiss Count One is denied.

## IV. *The Grand Jury Proceedings*

■ The indictment in this case states in paragraph one that the defendant "was an attorney licensed to practice in the State of New York, and a licensed real estate bro-

ker in the State of New York." Unquestionably, the defendant was a licensed attorney and had been so for perhaps a half century or more. The defendant was, at one time, a licensed real estate broker, but has not been so licensed since 1974. Although it appears that the grand jury was made aware of the fact that the defendant was an experienced real estate developer and manager, no evidence was presented to indicate that he still held a real estate license.[9] The holding of a real estate license, while perhaps evidentiary of his knowledge and state of mind, is not an essential element of the crime. The Government agrees that the allegation of being a licensed real estate broker should be stricken from the indictment and that portion of the motion is granted.[10]

The defendant also argues that Jane Wilson, an IRS attorney designated as a special prosecutor, may have improperly appeared before the grand jury. The Government has established through her affidavits that she did not appear before the grand jury.

Finally, because of the error made with respect to the holding of the current real estate license the defendant has asked that the court review the grand jury minutes to see if there were any other errors or possible prosecutorial conduct warranting a dismissal of the indictment. Without reviewing the minutes of the entire St. German Church investigation, the court has reviewed the grand jury minutes that refer to this defendant in particular. Nothing else in those minutes warrants court action.

## V. *The Motion to Suppress*

■ The most difficult aspect of the defendant's motions is his motion to suppress statements and documents given to Internal Revenue Service agents by the defendant in the course of an interview. The defendant argues that he was not advised

**9.** Another partner who appeared before the grand jury, Norman Mauser, is a licensed real estate broker.

**10.** The defendant also moves to strike the allegation that he was an attorney licensed to practice

in the state, claiming that it is prejudicial. Although it is an unnecessary allegation, being a member of the bar is clearly not a prejudicial matter. That application is, therefore, denied.

of his constitutional rights in violation of the fifth amendment of the United States Constitution and Internal Revenue Service regulations. When Special Agents John Kees and Alyssa Daversa interviewed the defendant in January 1987 at his office in New Rochelle, New York, they advised the defendant that they were pursuing a criminal tax investigation but accurately told Mauser that he was neither the subject nor a target of that investigation at that time. The defendant argues that, although he may not have been a subject, he was a "suspect" and that status, along with certain IRS regulations, triggered his right to *Miranda* warnings.

We will ignore for the moment the obvious fact that as an attorney of many years standing the defendant was well aware of his right to remain silent and his right to counsel. The interview conducted in the defendant's office was not a custodial interrogation. Hence, the United States Constitution does not require the giving of *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *accord United States v. Montgomery*, 675 F.Supp. 164, 171 (S.D. N.Y.1987) ("*Miranda* only applies when the suspect is subject to custodial interrogation."), *aff'd sub nom. United States v. Willoughby*, 860 F.2d 15 (2d Cir.1988), *cert. denied sub nom.*, — U.S. —, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989). The defendant argues, however, that IRS regulations nonetheless require an advisement of his constitutional rights.

Paragraph 9384.2 of the Internal Revenue Manual requires that *Miranda*-style warnings be given at the outset of "initial noncustody meetings with *subjects of investigation*." (emphasis added). It is clear that at the time the Special Agents interviewed the defendant he was not a subject of the investigation. The defendant argues, however, that he was suspected of criminal activity and that that suspicion entitled him to receive the warnings. The defendant bases his position on instructions reported in an IRS news release that "the Internal Revenue Service today described its procedures for protecting the Constitutional rights of persons *suspected* of criminal tax fraud during all phases of its investigations." I.R.S. News Release IR–897, *reprinted in* 1967 Stand.Fed.Tax Rep. (CCH) ¶ 6832 (October 3, 1967) (emphasis added). Additionally, the defendant directs the court to paragraph 9351(2) of the Internal Revenue Manual which provides that "[t]he principles set forth in IRM 9384 [cited above] relating to constitutional rights shall be adhered to during the interrogation of or conference with *a person who may be a possible defendant in a criminal trial.*" (emphasis added). It appears, therefore, that there is at least an ambiguity, if not an inconsistency, within the mandates of the Internal Revenue Service regulations. For this reason, without deciding whether the Special Agents should have given the defendant *Miranda*-style warnings, we will assume for the purposes of this motion that he was so entitled.[11]

The dispute thus becomes whether the failure of the IRS Special Agents to advise the defendant of his constitutional rights in a non-custodial interview, in apparent violation of IRS regulations, requires suppression of the statements and documents produced by the defendant. Our analysis must begin with the Supreme Court's decision in *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). In *Caceres*, unbeknownst to the defendant, three conversations that he had with an IRS agent were monitored by a recording device concealed on the agent's person.

---

**11.** We note, however, that yet another IRS regulation impacts upon this conclusion. Paragraph 9384.2(5) of the Internal Revenue Manual provides that

[i]f the subject of a grand jury investigation is interviewed by a special agent acting in the capacity of an assistant to the Attorney for the Government, advice regarding constitutional rights should be governed by those procedures applicable to grand jury investigations

rather than by the procedures applicable to investigations by Criminal Investigation.

It appears that, if the defendant is to be considered the subject of an investigation, it would be a grand jury investigation and the IRS regulations would be inapplicable. Because we can avoid an unnecessary construction of agency regulations, however, we do not resolve this question.

The defendant moved to suppress the tapes on the ground that the authorizations required by IRS regulations had not been obtained. The Court determined that the exclusionary rule may require suppression for violation of an agency regulation when compliance with the regulation is dictated by the constitution or federal statute. *Id.* at 749, 99 S.Ct. at 1470. Because "[n]either the Constitution nor Act of Congress require[d] that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants," *id.* at 744, 99 S.Ct. at 1467, the Court rejected the defendant's contention that exclusion was mandated. *Id.* at 755, 99 S.Ct. at 1473.

The *Caceres* Court also addressed the potential due process implications that can arise from detrimental reliance on agency regulations promulgated for the benefit of the defendant. In *Caceres* the Court determined that the defendant had not suffered a deprivation of due process both because he could not contend that he relied on the regulation, nor could he demonstrate that its breach had any impact on his conduct. *Id.* at 753, 99 S.Ct. at 1472. Indeed, he did not know that his conversations were being recorded. Additionally, the defendant in *Caceres* was not prejudiced by the failure to obtain the proper authorization as there was no doubt that the authorization would have been given had the application been made in a timely fashion. *Id.* Thus, because none of the defendant's constitutional rights had been violated, suppression was unwarranted. *Id.* at 755, 99 S.Ct. at 1473.

We think a similar conclusion is warranted here. Neither the constitution nor federal law require the issuance of *Miranda* warnings in a non-custodial setting. *Beckwith v. United States*, 425 U.S. 341, 345–48, 96 S.Ct. 1612, 1615–17, 48 L.Ed.2d 1 (1976). There is no doubt that the purpose of the IRS regulations was to extend the protections of *Miranda* to non-custodial inquiries into criminal tax violations. *United States v. Gentile*, 525 F.2d 252, 259 (2d Cir.1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976). It is equally clear, however, that the IRS was not compelled by any federal authority to enact such regulations. *United States v. Leonard*, 524 F.2d 1076, 1089 (2d Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

Similarly, the defendant in this case has not suffered a deprivation of his due process rights such that exclusion would be appropriate. There has been no suggestion that the defendant was aware of the IRS regulations, much less relied on them to his detriment. Moreover, the defendant cannot demonstrate that he was prejudiced by the absence of *Miranda*-style warnings. The affidavit of Special Agent John Kees, annexed to the government's Memorandum of Law in Opposition to Defendant's Pre-Trial Motions, specifically avers that all of the information and documentation produced by the defendant was later obtained through independent sources.

Under these circumstances, we see no need for an evidentiary hearing as requested by the defendant. Even assuming that the IRS agents acted in contravention of the IRS regulations pertaining to *Miranda*-style warnings, exclusion of the defendant's statements and documents would not be warranted. As in *Caceres*, we hold that exclusion is not the preferred remedy for noncompliance with agency regulations.

> Regulations governing the conduct of criminal investigations are generally considered desirable, and may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence in criminal trials.... In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.

*Caceres*, 440 U.S. at 755–56, 99 S.Ct. at 1473. For all these reasons, the defendant's motion to suppress is denied.

## VI. *Conclusion*

The defendant's motion is granted as to the dismissal of Counts Two and Three and

as to the striking from the indictment of the reference to the defendant holding a real estate license. The court has considered the arguments referred to above, as well as certain others, and denies all remaining aspects of the motions.

SO ORDERED.